## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| CHRISTINA LACHAPELLE, individually and on behalf of all others similarly situated,<br><br>_____Plaintiff,<br><br>v.<br><br>TIME INC. and MEREDITH CORPORATION,<br><br>_____Defendants. | Civil Action No.:  1:18-cv-00535-WES-PAS<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Christina Lachapelle ("Plaintiff"), individually and on behalf of herself and all others similarly situated, by and through her attorneys, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

## **INTRODUCTION**

1.      Defendants Time Inc. ("Time") and Meredith Corporation ("Meredith" and collectively, "Defendants") rented, exchanged, and/or otherwise disseminated personal information about Plaintiff Christina Lachapelle's _Time_ and _Sports Illustrated_ magazine subscriptions to data aggregators, data appenders, data cooperatives, and list brokers, among others, which in turn disseminated her information to aggressive advertisers.  As a result, Ms. Lachapelle has received a barrage of unwanted junk mail.  By renting, exchanging, and/or otherwise disclosing Ms. Lachapelle's Personal Reading Information (defined below) without her consent, Defendants violated Rhode Island's Video, Audio and Publication Rentals Privacy Act, General Laws § 11-18-32 (the "RIPA").

2.     Documented evidence confirms these facts.  For example, a list broker, Lake Group Media, Inc., ("Lake Group") offers to provide renters access to the Personal Reading Information of 10,113,788 subscribers from the "MEREDITH MAGAZINES ENHANCED MASTERFILE (FRMLY TIME INC)" list at a base price of "$115/M [per thousand]," (i.e., 11.5 cents apiece), including their names and addresses with the *Time* and *Sports Illustrated* magazine titles.



## MEREDITH MAGAZINES ENHANCED MASTERFILE (FRMLY TIME INC)

| | | |
|---|---|---|
| 10,113,788 Active Subscribers | $115.00/M | |
| 1,101,697 May'18 Subscribers | +$ 17.00/M | |
| 2,799,506 3 Mo Subscribers | +$ 12.00/M | |
| 5,110,447 6 Mo Subscribers | +$ 8.00/M | |
| Fundraising Rate | $ 75.00/M | |
| Catalog Rate | $ 80.00/M | |

Formerly TIME INC. MAGAZINES ENHANCED MASTERFILE

The Meredith Magazines Enhanced Masterfile is enhanced with Infobase demographic and lifestyle data for even better segmentation. It consists of the combined and unduplicated active subscribers to Entertainment Weekly, Fortune, Money, People, PeopleStyle, Southern Living, Sports Illustrated, TIME and Travel + Leisure.

These consumers come from variety of lifestyles, but with the broad range of demographic and purchase data available, combined with the substantial universe, even the most targeted campaigns will have success with this masterfile.

```
************ Fast Facts ****************
Average HH Income..................$106,199
Average Age.................................57
*******************************************
```

Can select by Adult Age @ $16.00/M extra:  (Please inquire for counts.)
  Age 30+
  Age 40+
  Age 50+
  Age 60+
  Age 70+
  Age 80+

Can select by Religion @ $16.00/M extra
(Inquire for additional selects and counts):
  Catholic
  Jewish
  Protestant

Can select by Lifestyle Interest @ $16.00/M
extra (Inquire for additional selects and counts):

  Collecting:
    Collectibles Interest
    Antiques
    Arts
    Coins
    Stamps

  Donors/Contributors:

**LAST UPDATE:**
June 28, 2018

**GENDER:**
35% Male/62% Female

**MINIMUM ORDER:**
7,500

**SOURCE:**
Direct Mail

| **MEDIA:** | |
|---|---|
| FTP | @ $50.00/F |

**UPDATE FREQUENCY:**
Monthly

| **SELECTION:** | |
|---|---|
| Monthly H/L | @ $17.00/M |
| 3 Mos H/L | @ $12.00/M |
| 6 Mos H/L | @ $ 8.00/M |
| COA | @ $14.00/M |
| Digital Subs | @ $20.00/M |
| Renewals | @ $14.00/M |
| New To File | @ $14.00/M |
| Gift Givers | @ $14.00/M |
| Source | @ $14.00/M |
| Paid | @ $11.00/M |
| Business Address | @ $14.00/M |
| Adult Age | @ $16.00/M |
| Child Age | @ $16.00/M |
| Child Presence | @ $16.00/M |
| Donors | @ $16.00/M |
| Ethnicity | @ $16.00/M |
| Homeowner | @ $16.00/M |
| Income | @ $16.00/M |
| Lifestyle | @ $16.00/M |
| Net Worth | @ $20.00/M |
| Credit Card | @ $11.00/M |
| Religion | @ $16.00/M |
| Voter | @ $16.00/M |
| Veteran | @ $16.00/M |
| Gender | @ $ 8.00/M |
| State | @ $10.00/M |
| SCF | @ $10.00/M |
| Zip | @ $10.00/M |

*See* Complaint Ex. B.

3.     Renters are able to access the Personal Reading Information of Defendants'

subscribers including, but not limited to, names, addresses, and magazine title, along with "age," "religion," "hobbies/interests," and "political party."  *Id.*

      4.      Defendants also offer access to their "Political Party Masterfile" list at the same base rate of "$115/M."



### MEREDITH POLITICAL PARTY MASTERFILE (FRMLY TIME INC.)

| | | | |
|---|---|---|---|
| 6,131,370 | Active Subscribers w/Political Affiliation | $115.00/M | **LAST UPDATE:** April 10, 2018 |
| 2,213,405 | Active Republican Subs | +$ 16.00/M | |
| 3,076,134 | Active Democratic Subs | +$ 16.00/M | **GENDER:** 36% Male/63% Female |
| 52,779 | Active Independent Subs | +$ 16.00/M | |
| 1,912,954 | Active No Party Subs | +$ 16.00/M | **MINIMUM ORDER:** 7,500 |
| | Political Affiliation (All Orders) | +$ 16.00/M | **SOURCE:** Direct Mail |
| | Fundraising Rate | $ 75.00/M | |
| | Catalog Rate | $ 80.00/M | **MEDIA:** |

MEDIA:
FTP     @ $50.00/F

Formerly TIME INC. POLITICAL PARTY MASTERFILE

**UPDATE FREQUENCY:**
Monthly

The Meredith Political Party Masterfile
consists of subscribers who have been identified as Democrats, Republicans, Independents, and/or Voter Registered – No Party through survey data from Acxiom's InfoBase. These consumers are also involved with politically affiliated charities and the file is also enhanced with demographic, lifestyle, and purchase data for even better segmentation.

The Meredith Political Party Masterfile consists of the combined and unduplicated masterfile of the active subscribers to Entertainment Weekly,Fortune, Money, People, PeopleStyle, Southern Living, Sports Illustrated, TIME and Travel + Leisure.

**\*\*Selectable by individual title - see separate data cards\*\***

**RELATED LGM LISTS:**
TEN: THE ENTHUSIAST NETWORK REPUBLICANS & DEMOCRATS MF
NUTRITION ACTION ENHANCED DEMOCRAT SUBSCRIBERS
LIFTBASE CONSUMER MASTERFILE
RODALE, INC. POLITICAL PARTY AFFILIATION MASTERFILE
LIFTBASE CONSUMER MASTERFILE: POLITICAL
TRUSTED MEDIA BRANDS - POLITICAL MASTERFILE
HEALTHY DIRECTIONS POLITICAL PARTY MASTERFILE

**FOR LIST RECOMMENDATIONS, CONTACT:**
Sheryl Benjamin; sheryl.benjamin@lakegroupmedia.com

**TO PLACE AN ORDER, CONTACT:**
Anjie Logan; anjie.logan@lakegroupmedia.com

**SELECTION:**

| | |
|---|---|
| Monthly H/L | @ $17.00/M |
| 3 Mos H/L | @ $12.00/M |
| 6 Mos H/L | @ $ 8.00/M |
| COA | @ $14.00/M |
| Digital Subs | @ $20.00/M |
| Renewals | @ $14.00/M |
| New To File | @ $14.00/M |
| Gift Givers | @ $14.00/M |
| Source | @ $14.00/M |
| Paid | @ $11.00/M |
| Business Address | @ $14.00/M |
| Adult Age | @ $16.00/M |
| Child Age | @ $16.00/M |
| Child Gender | @ $16.00/M |
| Child Presence | @ $16.00/M |
| Ethnicity | @ $16.00/M |
| Homeowner | @ $16.00/M |
| Income | @ $16.00/M |
| Lifestyle | @ $16.00/M |
| Net Worth | @ $20.00/M |
| Credit Card | @ $11.00/M |
| Political Affilation | @ $16.00/M |

*See* Complaint Ex. C.  For an additional "$16/M" over the base "$115/M" rate (i.e., 13.1 cents apiece), Lake Group offers access to the Personal Reading Information of subscribers who are

"Democrats" or "Republicans."  *See id.*

    5.    Defendants also offer access to their "Donor" list at the same base rate of

"$115/M."



## MEREDITH DONOR MASTERFILE (FRMLY TIME INC.)

| | | |
|---|---|---|
| 6,720,254 | Active Donors | $115.00/M |
| 722,114 | May'18 Active Donors | +$ 17.00/M |
| 1,820,991 | 3 Mos Active Donors | +$ 12.00/M |
| 3,343,953 | 6 Mos Active Donors | +$ 8.00/M |
| | Donors (All Orders) | +$ 16.00/M |
| | Fundraising Rate | $ 75.00/M |
| | Catalog Rate | $ 80.00/M |

Formerly TIME INC. DONOR MASTERFILE

The Meredith Donor Masterfile identifies donors to specific types of charitable causes and organizations across Meredith's magazine subscribers.  It consists of the combined and unduplicated active subscribers to Entertainment Weekly, Fortune, Money, People, Southern Living, Sports Illustrated, PeopleStyle, and Travel + Leisure.

By combining donor type with additional demographic, lifestyle, and purchase data elements, mailers can better target their own potential donors for their own prospecting efforts.

\*\*\*\*\*\*\*\*\*\*\*\*\* Fast Facts \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Average Age..............................63
Average HH Income..................$118,298
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

\*\*Selectable by individual title - see separate data cards\*\*

Can select by Donors Interest Category at $16.00/M extra:

| | |
|---|---|
| 1,105,486 | Animal Welfare |
| 6,398,293 | Arts/Culture |
| 1,151,477 | Children's Welfare |
| 1,671,310 | Environment/Wildlife |
| 2,584,764 | Health |
| 141,423 | International Aid |
| 217,268 | Political - Conservative |
| 126,873 | Political - Liberal |
| 1,531,627 | Religious |
| 911,982 | Veterans |

USAGE:
American Friends of Blind Greece
Food Bank Alliance
Rescue Missions
Sheriffs Association

LAST UPDATE:
June 28, 2018

GENDER:
39% Male/58% Female

MINIMUM ORDER:
7,500

SOURCE:
Agents, Direct Mail,
Insert Cards, Internet

MEDIA:
FTP        @ $50.00/F

UPDATE FREQUENCY:
Monthly

SELECTION:

| | |
|---|---|
| Donor | @ $16.OO/M |
| Monthly H/L | @ $17.00/M |
| 3 Mos H/L | @ $12.00/M |
| 6 Mos H/L | @ $ 8.00/M |
| COA | @ $14.00/M |
| Digital Subs | @ $20.00/M |
| Renewals | @ $14.00/M |
| New To File | @ $14.00/M |
| Gift Givers | @ $14.00/M |
| Source | @ $14.00/M |
| Paid | @ $11.00/M |
| Business Address | @ $14.00/M |
| Adult Age | @ $16.00/M |
| Child Age | @ $16.00/M |
| Child Presence | @ $16.00/M |
| Ethnicity | @ $16.00/M |
| Homeowner | @ $16.00/M |
| Income | @ $16.00/M |
| Lifestyle | @ $16.00/M |
| Net Worth | @ $20.00/M |
| Credit Card | @ $11.00/M |
| Religion | @ $16.00/M |
| Voter | @ $16.00/M |
| Veteran | @ $16.00/M |
| Gender | @ $ 8.00/M |
| State | @ $10.00/M |
| SCF | @ $10.00/M |

*See* Complaint Ex. D.  According to the list offering, "The Meredith Donor Masterfile identifies

donors to specific types of charitable causes and organizations across Meredith's magazine subscribers. … By combining donor type with additional demographic, lifestyle, and purchase data elements, mailers can better target their own potential donors for their own prospecting efforts." *Id.*

6.      Rhode Island's RIPA clearly prohibits this transmission of subscribers' identifying personal information by Defendants.  Subsection (a) of the RIPA provides:

> It shall be unlawful for any person to reveal, transmit, publish, or disseminate in any manner, any records which would identify the names and addresses of individuals, with the titles or nature of video films, records, cassettes, or the like, which they purchased, leased, rented, or borrowed, from libraries, book stores, video stores, or record and cassette shops or any retailer or distributor of those products, whether or not the identities and listings are kept in a remote computing service or electronic storage or the disclosure is made through or by a remote computing service.

R.I. Gen. Laws § 11-18-32(a).

7.      Accordingly, Plaintiff brings this Class Action Complaint against Defendants for their intentional and unlawful disclosure of their customers' Personal Reading Information in violation of the RIPA, and for unjust enrichment.

## **NATURE OF THE CASE**

8.      To supplement their revenues, Defendants rent, exchange, or otherwise disseminate their customers' personal information—including their full names, titles of magazines subscribed to, and home addresses (collectively "Personal Reading Information"), as well as myriad other personal, lifestyle, and demographic information such as gender, age, ethnicity, income, religion, parental status, and political affiliation—to data aggregators, data appenders, data cooperatives, and other third parties without the written consent of their customers.

9.      By renting, exchanging, or otherwise transmitting —rather than selling — their

customers' Personal Reading Information, Defendants are able to disseminate the identifying

information time and time again to countless third parties.

10.     Defendants' dissemination of Personal Reading Information, and other personal,

demographic, and lifestyle information is not only unlawful, but is also dangerous because it

allows for the targeting of particularly vulnerable members of society.  In fact, almost any

organization can rent a customer list from Defendants that contains a number of categories of

detailed subscriber information.  For example, almost any organization could rent a list with the

names and addresses of all *Sports Illustrated* customers who are Spanish speaking, female, over

the age of 80, with no children in the household, and with a net worth of greater than $500,000.

Defendants would rent such a list for approximately $180 per thousand customers listed.

11.     While Defendants profit handsomely from the unauthorized rental, exchange,

and/or disclosure of their customers' Personal Reading Information and other personal

information, they do so at the expense of their customers' privacy and statutory rights because

Defendants do not obtain their customers' written consent prior to disseminating their Personal

Reading Information.

## **PARTIES**

12.     Plaintiff Christina Lachapelle is a natural person and citizen of the State of Rhode

Island.  Plaintiff Lachapelle is a subscriber to *Time* and *Sports Illustrated* magazines, which are

published and sold by Defendants.  Plaintiff Lachapelle purchased her subscriptions to *Time* and

*Sports Illustrated* magazines directly from Defendants.  Prior to and at the time she subscribed to

*Time* and *Sports Illustrated*, Defendants did not notify Plaintiff Lachapelle that they disseminate

the Personal Reading Information of their customers, and Plaintiff Lachapelle has never

authorized Defendants to do so.  Furthermore, Plaintiff Lachapelle was never provided any

written notice that Defendants rent, exchange, or otherwise disseminate their customers' Personal

Reading Information, or any means of opting out.  Since subscribing to *Time* and *Sports Illustrated*, Defendants disseminated, without consent or prior notice, Plaintiff Lachapelle's Personal Reading Information (including her name and address with the *Time* and *Sports Illustrated* titles) to data aggregators and data cooperatives, who then supplement that information with data from their own files.  Moreover, during that same period, Defendants rented or exchanged mailing lists containing Plaintiff Lachapelle's Personal Reading Information to third parties seeking to contact Defendants' subscribers, without first obtaining Plaintiff Lachapelle's written consent or even giving her prior notice of the rentals, exchanges, and/or other disclosures.  Because Defendants rented, exchanged, and/or otherwise disseminated her Personal Reading Information, Plaintiff Lachapelle now receives junk mail from non-profit companies and other organizations that do not offer products or services through the mail.  These unwarranted mailings waste Plaintiff Lachapelle's time, money, and resources.  These harassing junk mailings received by Plaintiff Lachapelle are attributable to Defendants' unauthorized rental, exchange, and/or dissemination of her Personal Reading Information.  Because Plaintiff Lachapelle is entitled by law to privacy in her Personal Reading Information, and because she paid money for her subscription, Defendants' disclosure of her Personal Reading Information deprived Plaintiff Lachapelle of the full set of benefits to which she was entitled as a part of her *Time* and *Sports Illustrated* subscriptions, thereby causing economic harm.  Accordingly, what Plaintiff Lachapelle received (subscriptions without statutory privacy protections) was less valuable than what she paid for (subscriptions with accompanying statutory privacy protections), and she would not have been willing to pay as much, if at all, for her *Time* and *Sports Illustrated* subscriptions had she known that Defendants would disseminate her Personal Reading Information.

7

13.     Defendant Time Inc. is a Delaware corporation with its principal place of business at 225 Liberty Street, New York, NY 10281.  Time does business throughout Rhode Island, New York, and the entire United States.

14.     Defendant Meredith Corporation is a Iowa corporation with its principal place of business at 1716 Locust Street, Des Moines, IA 50309.  Meredith does business throughout Rhode Island, New York, and the entire United States.

15.     On January 31, 2018, Meredith acquired Time for $2.8 billion.[1]

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendants.  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

17.     This Court has personal jurisdiction over Defendants because Defendants conduct substantial business within Rhode Island, such that Defendants have significant, continuous, and pervasive contacts with the State of Rhode Island.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do substantial business in this District and a substantial part of the events giving rise to Plaintiff's claims took place within this judicial District.

## FACTUAL BACKGROUND

---

[1] http://meredith.mediaroom.com/2018-01-31-Meredith-Corporation-Announces-Completion-Of-Time-Inc-Acquisition-And-Reports-Fiscal-2018-Second-Quarter-And-First-Half-Results (last visited Sept. 7, 2018).

### *Rhode Island's Video, Audio And Publication Rentals Privacy Act*

19.     In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and written materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

20.     Recognizing the need to protect their citizens' privacy rights even further, the Rhode Island General Assembly enacted the RIPA in 1988 to "prohibit[] the revealing of records relating to the rental of video or audio tapes or publications." Explanation By The Legislative Council, attached as **Exhibit A**.

21.     RIPA's enactment heading reads "Video, audio and publication rentals." *See* R.I. Gen. Laws § 11-18-32.

22.     Subsection (a) of the RIPA states:

> It shall be unlawful for any person to reveal, transmit, publish, or
> disseminate in any manner, any records which would identify the
> names and addresses of individuals, with the titles or nature of
> video films, records, cassettes, or the like, which they purchased,
> leased, rented, or borrowed, from libraries, book stores, video
> stores, or record and cassette shops or any retailer or distributor of
> those products, whether or not the identities and listings are kept in
> a remote computing service or electronic storage or the disclosure
> is made through or by a remote computing service.

R.I. Gen. Laws § 11-18-32(a).

23.     RIPA is a broadly worded privacy statute that extends protections to transactions regarding "video films, records, cassettes, or the like [procured] from libraries, book stores … or any retailer or distributor of those products." R.I. Gen. Laws § 11-18-32(a).

24.     In the context of the RIPA, written materials, including magazines, are "like" the video and audio materials discussed in the statute.  Thus, the RIPA expressly lists "libraries" and "book stores" among the retailers and distributors of those products falling under its privacy protections.

25.     In the 1980s (when RIPA became a law), the vast majority of the collections and inventories of libraries and book stores in Rhode Island consisted of written materials including books and magazines.  The same is true continuing through to today.

26.     Moreover, in 2015 Rhode Island implemented the Library of Rhode Island Interlibrary Loan Code, which requires that "[l]ibrary staff must adhere to state laws regarding confidentiality of information of identifying individuals who borrow library materials, including R.I. Gen. Laws § 11-18-32 [the RIPA]."  R.I. Admin. Code 2-4-4:3.4(E).  The regulation defines library materials to include "magazines" as well as "books" and "journals."  R.I. Admin. Code 2-4-4:3.4(B)(2).

27.     The regulation likens magazines, books, and journals to video and audio materials by categorizing them all as "library material."  R.I. Admin. Code 2-4-4:3.4(B)(1)-(2).

28.     The confidentiality protections of RIPA encompass "purchase[s]" of written materials, such as books and magazines, "from any retailer or distributor of those products," like Defendants.  R.I. Gen. Laws § 11-18-32(a).

29.     Despite that thousands of Rhode Island residents subscribe to Defendants' magazines, Defendants disregarded their legal responsibility by systematically violation the RIPA.

***The Personal Information Market:  Consumers' Personal Information Has Real Value***

30.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle

10

remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[2]

31.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[3]

32.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency.  The larger the data set, the greater potential for analysis—and profit.[4]

33.     In fact, an entire industry exists where companies known as data aggregators purchase, trade, and collect massive databases of information about consumers.  Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[5]

---

[2] The Information Marketplace:  Merging and Exchanging Consumer Data (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited Aug. 30, 2018).

[3] *See* Web's Hot New Commodity: Privacy, WSJ.com (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited Aug. 30, 2018).

[4] Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2,  *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited Aug. 30, 2018) (emphasis added).

[5] *See* Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited Aug. 30, 2018).

34.     The scope of data aggregators' knowledge about consumers is immense:  "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[6]

35.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[7]

36.     Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[8]

37.     In their letter, the co-Chairmen recognized that:

> By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer. This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[9]

---

[6] Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited Aug. 30, 2018).

[7] Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited Aug. 30, 2018).

[8] *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited Aug. 30, 2018).

[9] *Id.*

38.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[10] including fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like Defendants share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases of names and personal information" that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[11]

39.     Information disclosures like Defendants' are particularly dangerous to the elderly.  "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[12]  The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[13]

---

[10] *See Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited Aug. 30, 2018).

[11] Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html?pagewanted=all&_r=0 (last visited Aug. 30, 2018).

[12] *Id.*

[13] *Fraud Against Seniors:  Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited Aug. 30, 2018).

40.     Indeed, an entire black market exists where the personal information of vulnerable elderly Americans is exchanged.  Thus, information disclosures like Defendants' are particularly troublesome because of their cascading nature:  "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[14]

41.     Defendants are not alone in jeopardizing their subscribers' privacy and well-being in exchange for increased revenue:  disclosing subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the publishing industry.

42.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth.  Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

***Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases***

43.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their personal information.

44.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[15]  As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[16]

---

[14] *See id.*

[15] *See 2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited Aug. 30, 2018).

[16] *Id.*

45.     Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.

46.     In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[17]

47.     These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[18]

48.     Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[19] As such, when a business offers customers a service that includes statutorily guaranteed privacy protections, yet

---

[17] *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited Aug. 30, 2018).

[18] *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited Aug. 30, 2018).

[19] *See* Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited Aug. 30, 2018) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.")

fails to honor these guarantees, the customer receives a service of less value than the service paid for.

### *Defendants Unlawfully Rent, Exchange, And Disseminate Their Customers' Personal Reading Information*

49.     Defendants maintain a vast digital database comprised of their customers' Personal Reading Information.  Defendants disseminate their customers' Personal Reading Information to data aggregators and appenders who then supplement that information with additional sensitive personal information about each of Defendants' customers, including gender, purchasing habits, political affiliation, religious practice, charitable donations, and (when applicable) number, age, and gender of the subscriber's children.  (*See, e.g.*, **Exhibits B-D**).

50.     Defendants then rent and/or exchange their mailing lists—which include subscribers' Personal Reading Information identifying which individuals purchased which magazines, and can include the sensitive information obtained from data aggregators and appenders—to other data aggregators and appenders, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts. (*See* **Exhibits B–D**).

51.     Defendants also disseminate their customers' Personal Reading Information to data cooperatives, who in turn, give Defendants access to their own mailing list databases.

52.     As a result of Defendants' data compiling and sharing practices, companies can purchase and/or obtain mailing lists from Defendants that identify Defendants' customers by their most intimate details:  income, political affiliation, religious practice, and charitable donations.  Defendants' disclosure of such sensitive and personal information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.  For

example, Defendants will rent—to almost any organization willing to pay for it—a list with the names and addresses of all *Sports Illustrated* customers who are Jewish, Republican, single, over the age of 80, with a net worth of greater than $500,000, no children in the household, and a history of charitable donations.

53.     Defendants do not seek their customers' prior written consent to any of these disclosures and their customers remain unaware that their Personal Reading Information and other sensitive personal information is being rented and exchanged on the open market.

54.     Consumers can sign up for Defendants' subscriptions through numerous media outlets, including the Internet, telephone, or traditional mail.  Regardless of how the consumer subscribes, Defendants never require the individual to read or agree to any terms of service, privacy policy, or information-sharing policy.  Consequently, Defendants uniformly fail to obtain any form of consent from – or even provide effective notice to – their customers before disclosing their Personal Reading Information.

55.     As a result, Defendants disseminated their customers' Personal Reading Information – including their reading habits and preferences that can "reveal intimate facts about our lives, from our political and religious beliefs to our health concerns"[20] – to anybody willing to pay for it.

56.     By and through these actions, Defendants have intentionally disseminated to third parties their Rhode Island customers' Personal Reading Information without consent, in direct violation of the RIPA.

---

[20] *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited Aug. 30, 2018).

17

## **CLASS ACTION ALLEGATIONS**

57.    Plaintiff seeks to represent a class defined as all Rhode Island residents who had their Personal Reading Information transmitted to third parties by Defendants without consent (the "Class").  Excluded from the Class is any entity in which Defendants have a controlling interest, and officers or directors of Defendants.

58.    Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class number in the thousands.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants.

59.    Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:  (a) whether Defendants are "retailers or distributors" of magazines; (b) whether Defendants obtained consent before disclosing to third parties Plaintiff's and the Class's Personal Reading Information; (c) whether Defendants' disclosure of Plaintiff's and the Class's Personal Reading Information violated Rhode Island General Laws § 11-18-32; and (d) whether Defendants' rental, exchange, and/or disclosure of Plaintiff's and the Class's Personal reading Information constitutes unjust enrichment.

60.    The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff and the Class sustained damages as a result of Defendants' uniform wrongful conduct, based upon Defendants' disclosure of Plaintiff's and the Class's Personal Reading Information.

61.    Plaintiff is an adequate representative of the Class because her interests do not

conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and her counsel.

62.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I
### Violation of the Video, Audio and Publication Rentals Privacy Act
### (R.I. Gen. Laws § 11-18-32)

63.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

64.     Plaintiff brings this claim individually and on behalf of members of the Class against Defendants.

65.     As publishers that sell subscriptions directly to consumers, Defendants are retailers or distributors of magazines.  *See* R.I. Gen. Laws § 11-18-32(a).

66.     By purchasing subscriptions to *Time* and *Sports Illustrated*, Plaintiff purchased a magazine from Defendants.  *See* R.I. Gen. Laws § 11-18-32(a).

67.     At all times relevant, and beginning on the dates Plaintiff initiated her *Time* and *Sports Illustrated* subscriptions, Defendants disseminated Plaintiff's Personal Reading Information, which identified her as a *Time* and *Sports Illustrated* customer, in at least three ways.

68.     First, Defendants disseminated mailing lists containing Plaintiff's Personal Reading Information to data aggregators and data appenders, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to Defendants.

69.     Second, Defendants disseminated mailing lists containing Plaintiff's Personal Reading Information to data cooperatives, who in turn gave Defendants access to their own mailing list databases.

70.     Third, Defendants rented and/or exchanged their mailing lists containing Plaintiff's Personal Reading Information—enhanced with additional information from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes.

71.     Because the mailing lists included the additional information from the data aggregators and appenders, the lists were more valuable, and Defendants were able to increase their profits gained from the mailing list rentals and/or exchanges.

72.     By renting, exchanging, or otherwise disseminating their customer lists, Defendants disseminated or transmitted to persons other than Plaintiff records which would identify her name and address with the titles of the magazines she purchased.  *See* R.I. Gen.

Laws § 11-18-32(a).

73.     Plaintiff and the members of the Class never consented to Defendants disclosing their Personal Reading Information to anyone.

74.     Worse yet, Plaintiff and the members of the Class did not receive notice before Defendants disseminated their Personal Reading Information to third parties.

75.     On information and belief, Defendants' disclosures of Plaintiff's and the Class's Personal Reading Information were not made pursuant to lawful compulsion.

76.     Defendants' disclosures were not made to other employees of Defendants' incident to the normal course of their work.  Defendants' disclosures of Plaintiff's Personal Reading Information were made to third parties, including, but not limited to, data aggregators, data appenders, data cooperatives, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase Defendants' revenue.

77.     By disclosing Plaintiff's Personal Reading Information, Defendants violated Plaintiff's and the Class's statutorily-protected right to privacy.  *See* R.I. Gen. Laws § 11-18-32(a).

78.     Additionally, because Plaintiff and the members of the Class paid for their subscriptions to Defendants' magazines, and Defendants were obligated to comply with the RIPA, Defendants' unlawful disclosure of Plaintiff's and the other Class members' Personal Reading Information deprived Plaintiff and the Class members of the full value of their paid-for subscriptions.  Because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, Defendants' unlawful rental, exchange, and/or other disclosure of their Personal Reading Information caused them to receive less value than they paid for, thereby causing them economic harm.

79.     Likewise, because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, a magazine subscription that keeps their Personal Reading Information private is more valuable than one that does not.

80.     Accordingly, had Plaintiff been adequately informed of Defendants' disclosure practices, she would not have been willing to purchase her *Time* and *Sports Illustrated* subscriptions at the price charged, if at all.  Thus, Defendants' unlawful disclosures caused Plaintiff economic harm.

81.     Defendants' disclosure of Plaintiff's Personal Reading Information to third parties has also caused an influx of third party print advertisements.

82.     As a result of Defendants' unlawful disclosure of their Personal Reading Information, Plaintiff and the members of the Class have suffered privacy and economic injuries. On behalf of herself and the Class, Plaintiff seeks:  (1) an injunction requiring Defendants to obtain consent from Rhode Island customers prior to the disclosure of their Personal Reading Information as required by the RIPA; (2) actual damages or $250.00, whichever is greater, for each violation, per Class member pursuant to R.I. Gen. Laws § 11-18-32(d); and (3) costs and reasonable attorneys' fees pursuant to R.I. Gen. Laws § 11-18-32(d).

## COUNT II
### Unjust Enrichment

83.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

84.     Plaintiff brings this claim individually and on behalf of the members of the Class against Defendants.

85.     Plaintiff and the Class members conferred benefits on Defendants by providing Defendants with their Personal Reading Information and paying Defendants for their magazine

22

subscriptions.

86.     Defendants received and retained the information and money belonging to
Plaintiff and the Class when Plaintiff and the Class subscribed to Defendants' publications.

87.     Because Defendants received and processed Plaintiff's and the Class's
subscription payments and Personal Reading Information, and because Defendants have
employees and/or agents handling customer accounts and billing as well as customer data,
Defendants appreciate or have knowledge of such benefits.

88.     Under the RIPA, Plaintiff and the Class members were entitled to confidentiality
in their Personal Reading Information as part of their subscriptions.

89.     Under principles of equity and good conscience, because Defendants failed to
comply with the RIPA, Defendants should not be allowed to retain the full amount of money
Plaintiff and the Class paid for their subscriptions or the money they received by renting,
exchanging, and/or otherwise disclosing Plaintiff's and the Class's Personal Reading
Information.

90.     Moreover, Defendants should not be allowed to retain the monies they received as
a result of renting, exchanging, and/or otherwise disclosing Plaintiff's and the Class's Personal
Reading Information.

91.     Plaintiff and the other Class members have suffered actual damages as a result of
Defendants' unlawful conduct in the form of the value Plaintiff and the other Class members
paid for and ascribed to the confidentiality of their Personal Reading Information.  This amount
is tangible and will be calculated at trial.

92.     Additionally, Plaintiff and the Class members have suffered actual damages
inasmuch as Defendants' failure to inform them that they would disseminate their Personal

Reading Information caused them to purchase magazine subscriptions when they otherwise would not have.

93.     Further, a portion of the purchase price of each of Defendants' magazine subscriptions sold to Plaintiff and the other Class members was intended to ensure the confidentiality of Plaintiff's and the other Class members' Personal Reading Information, as required by the RIPA.  Because Plaintiff and the other Class members were denied services that they paid for and were entitled to receive—i.e., confidentiality of their Personal Reading Information—and because Plaintiff and the Class would have commanded a discount to voluntarily forego those benefits, they incurred actual monetary damages.

94.     To prevent inequity, Defendants should return to Plaintiff and the Class the value they ascribe to confidentiality of their Personal Reading Information and all money derived from Defendants' rental, exchange, and/or other disclosure of Plaintiff's and the Class's Personal Reading Information.

95.     Accordingly, Plaintiff and the Class members seek an order declaring that Defendants' conduct constitutes unjust enrichment, and awarding Plaintiff and the Class restitution in an amount to be calculated at trial equal to the amount of money obtained by Defendants through their rental, exchange, and/or other disclosure of Plaintiff's and the Class's Personal Reading Information.

## PRAYER FOR RELIEF

96.     WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendants as follows:

> A.     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class.

24

B.   For an order declaring that Defendants' conduct as described herein violates the Video, Audio And Publication Rentals Privacy Act, R.I. Gen. Laws § 11-18-32;

C.   For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

D.   For an award of actual damages or $250, whichever is greater, for each violation, to Plaintiff and each Class member, as provided by the Video, Audio And Publication Rentals Privacy Act, R.I. Gen. Laws § 11-18-32(d);

E.   For prejudgment interest on all amounts awarded;

F.   For an order of restitution and all other forms of equitable monetary relief;

G.   For injunctive relief as pleaded or as the Court may deem proper; and;

H.   For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated:  February 22, 2019                    Respectfully submitted,

**LAW OFFICES OF PETER N. WASYLYK**

By:   */s/ Peter N. Wasylyk*
         Peter N. Wasylyk

Peter N. Wasylyk (RI Bar # 3351)
1307 Chalkstone Avenue
Providence, RI 02908
Telephone:  (401) 831-7730
Facsimile:  (401) 861-6064
Email:  pnwlaw@aol.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (*Pro Hac Vice* Forthcoming)
Joseph I. Marchese (*Pro Hac Vice*)
Philip L. Fraietta (*Pro Hac Vice*)
888 Seventh Avenue
New York, NY  10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
Email:  scott@bursor.com
        jmarchese@bursor.com
        pfraietta@bursor.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**


I hereby certify that on February 22, 2019, I electronically filed this Plaintiff's First Amended Class Action Complaint. Notice of this filing will be sent by email to all Attorneys of Record by operation of the Court's Electronic Filing as indicated on the Notice of Electronic Filing. This document is available for viewing and downloading from the Court's Electronic Case Filing System.


/s/ Peter N. Wasylyk
Peter N. Wasylyk (R.I. Bar # 3351)